Thank you Mr. Carpenter. Our next case is ROSCO v. MIRROR LITE. Mr. Arts. I hope this case didn't contribute to the demise of Judge Sifton. We all regret that. You may proceed. Good morning, Your Honor. May it please the Court. Since this Court has reversed the District Court on two separate occasions in this case, I think the Court is acutely aware that this District Court struggled with issues of patent law, struggled with issues of evidentiary issues. We're here today because the District Court clearly struggled again in June of last year when it issued the third opinion. It's been ten years. It's been a long time. It was patent issued in 1996. Do you want us to send it back again? No. We'd like you to say that the Judge was in error. At five separate times, we proved that these mirrors infringed. Five separate. The Judge only considered one. But you're talking about credibility here. Judge Sifton looked at Dr. Howell's evidence with care, consideration, and said there are just too many holes in it. He didn't even record his results. How can an expert witness not record their results? There's no requirement under the rule to do that. For heaven's sakes, that's hardly an answer that there's no requirement under the rules. I can't imagine an instance where an expert wouldn't have fully documented results. There are two things here, Your Honor. One is this is such a simple test. It's something a high school student could do with five minutes of instruction. That's not what the District Court found. What's that? That's not what the District Court found. Well, the District Court had trouble with scientific things. Different pressure at different times. If you angle that device slightly, you get a different reading. But he testified he did not do any of those things. The Judge said he found this very difficult to do. This is not difficult to do. Once you determine what these are, you can use a grid like he did. You can mark them on the major and minor axes like he did. He placed this thermometer, which is something that's been in existence for 50 years, used for the same purpose, on and on again, by both Orozco and Miralite, for decades, using on these mirrors. See, when you put this plunger in the middle, the needle moves. You place this on this. This is what Professor Howell testified. At least twice on direct and once on redirect. You place it on this point. You move it slowly, making sure that it's perpendicular. He said that. Make sure it's perpendicular along here. He didn't apply too much pressure. He said that to the edge. If this moves at all, then it fringes. The claim only requires any decrease whatsoever in the radius of curvature along this line. If that curvature changes at all in a decreasing way, it's infringement. That's what the claim construction says. That's what the court found on two earlier occasions with two other sets of mirrors. Yeah, but we're dealing with a fact finding here, and you're very candid in your brief. You say that Howell was credible and the district court made a mistake in finding him not credible. I mean, how are we supposed to address that? That doesn't sound like an issue for the Court of Appeals. It's not really credibility determination, Your Honor. The judge didn't understand. You characterize it as such in your brief. You say that he was disbelieved based on biased test witnesses, that the judge made a credibility error. There are five different ways we can do infringement. Didn't you argue that in your brief? The judge didn't understand. Didn't you argue that in your brief? I say he was very credible. He was. He's a Ph.D. mechanical engineer from a technical college in Michigan. That's right. He had no reason to lie. And by doing this test, he'd done a lot of tests in his whole career. It's because the judge found there may be some errors on speculation and conjecture. None of those were ever proved. No one ever said he did that. His only testimony was that he did it exactly the same way that Roscoe did it himself when they performed it. But his testimony wasn't the only evidence in the case. There was testimony from the mold manufacturer as to the fact that the mold was made with a constant curvature. If anything, the mold manufacturer, if I recall correctly, remarked that the requirement from the customer was to provide a constant curvature on the mirror and to make sure that happened even if the edges contracted on cooling, that the mold was adjusted accordingly, which Professor Howell commented could be done if that was the goal. Professor Howell has said several things, one of which is that due to the construction of this mirror, because it does actually shrink, all plastic shrinks, molded plastic, because of this construction along here, it shrinks more here, which means that when this is cooled, it comes in. It's automatically a decrease. Roscoe actually admitted there's a decrease, and that's the thing. But didn't the mold manufacturer say that they adjusted for that? He said he took into account that there would be not any more than a 30,000th decrease. One way or the other, right? Well, Professor Howell did close to 200,000. Plus or minus, correct? A tolerance could be plus or minus. You're not answering my question. Plus or minus, right? It could be, but Professor Howell didn't find any increases whatsoever. If you want to have a tolerance, it's got to be plus or minus. Every test he did, over 24 to 30 lenses, and then the original three that were represented by Roscoe to MirrorLite, he tested every one. He said at least six times, not only did he test along the major axis, he did it beside the major axis to make sure that it was credible and scientific. He did it as accurately as possible every time, and he found there was constantly a decrease in the rays of curvature every time. All he had to do was see if this needle moved when he went along here. He didn't have to see what that variation was. As a matter of fact, this 30,000th that Roscoe says is, quote, a constant mirror, the mirrors that the court already found infringing had decreases of 10,000 to 15,000, one set by vacuum-formed, another set of vacuum-formed mirrors by 15,000 to 20,000. And this was 1,000 to 5,000. So this 30,000th, there is no law of tolerance exception infringement. If Patton's claim says what's been construed, any decrease regardless of the magnitude is an infringement, therefore it infringes, and therefore their admission that there is a, quote, variance. That's what they call it. It's a decrease, a variance. They admitted there's a variance. They admitted there was a variance, but they didn't say that it was a decrease. They said specifically that it wasn't. There are only two ways a variance could be, plus or minus. Right, so it could be an increase. If it was constant, if it was a plus, they would have said so. They said it was a variance. They said they did it with a spherometer, and that's why they ran away from the spherometer test. A variance could be an increase, too. It wasn't, though. A variance could be, yes. Their testimony was that they did not measure a decrease, right? Their testimony is they measured a variance. Not a decrease. Well, they called it a variance. It doesn't translate into a decrease, right? Of course it's a decrease. What else would it be? It could be increase or decrease. Dave, I'm talking about the testimony, not what you think. The testimony was that it doesn't translate into a decrease. They said it was a variance, and it was a decrease, and they said they wouldn't call it a decrease. But their testimony, their position, if it's within 30 thousandths of an inch, it's constant, even if it's a decrease. Now, that is contrary to all patent law. There is no tolerance exception. That's contrary to the rule of the case. With this judge that said earlier, found on two occasions any decrease regardless of the amount is an infringement. Now, we have five separate instances of proof. The only one the court referred to was Professor Howell's test on mirrors 1, 2, and 5. He also tested another 24 to 30 mirrors, which the court did not take into account. And, in fact, the court specifically excluded them in a footnote. So he ignored them. And those 24 to 30, he found the same thing. That there is a decrease every time. These spherometer readings are governed by a body, the FMVSS, is that right? There is a Federal Motor Vehicle Safety Standard, yes. Yes, and now those talk about placing that device in ten different locations. It doesn't talk about sliding them, does it? There are two ways to use it. They use it this way. I agree with you, yes. So, as a matter of fact, the district court could have just found that Dr. Howell did not perform the proper test. He wasn't determined the radius of curvature. That test has determined what the actual radius of curvature is. The radius of curvature, this must be several feet, the actual radius, right? So all that we're doing now is seeing if there is a decrease, any change, any variance in the decrease. That's all we're doing with this. This is the way that Roscoe used the spherometer at the trial in 2000 before Judge Sifton. He actually sat in the witness stand, put the spherometer in the mirror, went over here, and saw there were 18 thousandths of an inch decrease. That, he proved there was a decrease in the radius of curvature. They also had an exhibit they put in showing the test. And Professor Howell said he did his test exactly the same as Roscoe performed his test on this video. The other test... Now, I wonder if I could slip you over into damages for just a second. Sure. You come up with a $2.50 royalty per unit, right? Yes. But that's based on the theory that all of the units are infringing, that there are no non-infringing substitutes, right? Because that is incorrect, by definition it's an incorrect, by grain processing and a dozen other Federal Circuit opinions, that's an incorrect methodology. The District Court used that as half of its analysis. It used an incorrect $2.50, compared it with the $1.00 that was put in by Roscoe and averaged it at $1.75. But, as a matter of fact, the top number you gave us is, as a matter of law, incorrect and should not have been used. Why doesn't this Court find that the only supported royalty is $1.00 and decrease it by $0.75 a unit? The original royalty was put in only for the period of time from 1996 to 2000, that was it. We didn't have any lost profits analysis at that point and we couldn't go back into it as a judge wouldn't let us. And so the original royalty is for that period. At that point, the only mirrors that Roscoe was making were infringing. All those mirrors from 1996 to 2000 were found to infringe by the Court in its opinion in 2005. Every mirror, they're all vacuum-borne. As a matter of fact, Roscoe even admitted at trial that everyone had decreased and raised the curvature. But the market had available non-infringing alternatives, did it not? Back in 1992 was the only one. No. Nothing between 1996 and 2000. There was no proof whatsoever that there was available non-infringing alternatives at that point in time. Well, he found that there could have been, that it was easy enough for them to manufacture one, right? That's the grain processing test, that they were not necessarily on the market at the time, but they, as Judge Dyke pointed out, it was easy to do. Everyone knew how to do it, so there were, in the market sense, non-infringing alternatives available. Therefore, the $2.50 mark that you set is a matter of law wrong, right? Well, there are two points. Judge Simpson went through the Georgia-Pacific analysis. There were 10 of the 15 issues that he said were relevant to here. Nine out of the 10 went in favor of mirror light, and yet he then reduced mirror light's 250 by 30%. It seems to me if nine out of 10 went in mirror light's favor, he should have increased it from 250 up, not decreased it. That's my first point. Yeah, except that we found a legal flaw in the 250, so that throws it out. The only thing we're left with is the $1, right? I don't think there was a legal flaw. I can attest to that, Your Honor. I don't think there was. He made some assumptions because he didn't have the information from Roscoe, because Roscoe withheld its salaries. Now, the whole thing, this is 14 years of infringement, Your Honor. Every mirror that Roscoe found, this was something that increased the safety for children's school buses. It's in use. There's a million of these now in use. Roscoe didn't make one with a constant radius of curvature. It knew because this one has a larger field of view and larger images in the side. These are put on the front of fenders of the bus. It allows the bus driver sitting in the seat when the bus is stopped to see in front of the bus and beside the bus much better than any other mirror before. Congress had a crisis point in the early 1990s and decided it needed to do something. This invention was the result. It is now on 500 buses in the United States. And what does Mirror Light have for all of this? It's got $397,000. What does Roscoe have for his 14 years of infringement? The four Englander family members took home $20 million in profits over the last six to eight years. And now they're saying that $397,000 was generous. They have the nerve to say that's generous. I mean, the only thing possible here is for this, the court, to reverse what Judge Stephan has done. It's really not a credibility issue. It's a fact the judge made clear errors not only on Professor Howell, but he ignored Dan Swain, who made separate tests of his own on all these mirrors and found the infringed. He's been doing this for 10 years, a decade. Used it as an ordinary course of business. He knew how to do it. The principal criticism I have of Swain is his hand shook once in a while, but it never proved that that made a difference. He used this continuously in his practice. He found the infringed. He wasn't qualified as an expert, right? Well, no. Either it was Ben Englander. He was not qualified as an expert. No. Yes, he was not qualified as an expert. No, he was not qualified. No. He was the vice president engineer of Mirror Light. Do you want to save rebuttal time? Yes, Judge. I'll tell you what. We'll give you back your full three minutes. Okay. And could you give Mr. Stoner an additional three if he needs to use them? Thank you, Your Honor. May it please the Court. I believe the record is undisputed in this case that Roscoe went to its manufacturer specifying to build a constant curvature mirror that would not infringe this patent. As Judge Sipton observed, Roscoe did that even before it had been found to have infringed and designed around this, as court's precedent advises companies to do. And Judge Sipton was not clearly wrong in finding that the manufacturer failed or had not failed to do that. The patent claim in this case required Mirror Light to prove a specific geometric configuration of the accused devices. And that required proof of three things simultaneously. One, that one follow a precise straight line that's oriented to the major axis of the ellipsoid. Two, because that straight line in the Y dimension follows a curved surface, you needed to follow that surface precisely. And three, as you move along that straight line over the curved surface, you detect whether there is a decrease in the radius of curvature. This test, according to Mirror Light, needs to be done to tolerances on the order of thousandths of an inch. The tests that Mirror Light presented failed to meet its burden. And to be clear, they presented no scientific proof, no scientific tests at all. What they presented was the memory of a man who had never done this before, of tests he says he did, that were uncorroborated, unverified, not reproduced at trial. Could not be reproduced at trial because he had effectively destroyed the objects he tested. But even accepting... Where did the scratches come from? Well, testimony is conflicting on that. His first testimony, Dr. Howell, was he created the scratches by using the spirometer, scratching the mirror when he tested it. I thought he testified that he didn't know where they came from. They weren't there when he tested it. That's what he testified later. There was conflicting testimony on this subject. He testified both that he may have scratched them, he didn't know where they came from, that it came from handling in the courtroom. But he first testified he scratched them with the spirometer doing his test, which would mean he was applying a lot of pressure as he moved across the spirometer. But even accepting what he says he did at his face, it does not meet what the patent claim requires. Did he follow the straight major axis of the ellipsoid? He did not. For most of the mirrors he tested, he said he eyeballed them. He put them down on a grid, he sort of guessed where the major axis was, and then he moved along that axis. Later on he marked a few of them. Did he follow the curved surface that the major axis was supposed to follow accurately? He did not. He did not try to maintain it perpendicular. And here there was more conflicting testimony. Dr. Howell says, well, because it's awfully hard for me to do these three things simultaneously, read the dial while I'm looking at the major axis and keeping it even, I had a man, Mr. Swain, there to watch me and make sure I kept the dial upright. Mr. Swain testified he didn't see Dr. Howell's tests at all. So someone was not telling the truth. And it makes the testimony of Dr. Howell not credible. He scratched the mirrors through excess pressure, if you believe one version of his story, where the scratches came from. Which means that he was not following the surface precisely, but he was gouging into it with a sharp object. And the mirrors, of course, cannot be tested again. Did he perform these two actions while simultaneously performing the third action of detecting a slight decrease or a decrease in the radius of curvature? And he did not. Again, this is a very sensitive instrument. A small swing in the dial, as the record was very clear, it translates into very large increases in radius or changes in radius of curvature. He made no record of the measurements he did. At first he said he could not even recall what the dial measurements were. Later on he said he could recall. But his recollections were contradictory and in some ways impossible. In the one case he remembered that he observed a change in the radius of the curvature on the order of tens of thousands of an inch. But that would require him to observe a movement in the dial that cannot be perceived. But the extent of the difference in the measurement is not really relevant to the claim, is it? The claim just calls for an increase in curvature. So if he observed an increase, what difference does it make that he didn't write down the amount? That is true. Your first statement that the claim does not require any specific quantitative decrease is absolutely true. But it is an indicia of credibility and reliability of any scientific test that the results of the test are recorded so that if someone wants to determine later that these tests actually proved what you say you found, someone can repeat that test and see if this is true. Would it have made any difference if he had written down on a piece of paper 27 tests, increase curvature, test 2, increase curvature, test 3, increase curvature? That would be credible. But the fact that he did the test and observed an increase in curvature and then reflected that conclusion in an affidavit doesn't have credibility. There is a difference between the two. I think there is a difference. Because in the first instance, these are purporting to be scientific records of experiments that were done that other people can then review to see, one, does this inherently make sense? And two, if I try to perform the same test again, do I get the same results? And that repeatability of any test is an indicia of credibility. That was not possible here because there were no records kept. There could have been other records kept too. You could have taken a videotape or a photograph, something to say, to show that what he claims to have done was actually done. Can you shift over to damages and address some of the issues that were raised by Chief Judge Rader? Yes, yes. Chief Judge Rader was correct. The testimony is that an available, acceptable, non-infringing alternative process to make these mirrors was available as early as 1992, before the date of first infringement. It is correct that Roscoe was not selling the non-infringing mirrors until 2000, and in 2000 moved to the molding process, the injection molding process, that will create non-infringing mirrors. But the record is, although Judge Sifton said it wasn't clear to him, the record was actually clear that that injection molding process was available long before that. It may not have been used by Roscoe. But your problem with my line of reasoning is that you said on page 57 of your brief, the reasonable royalty found by Judge Sifton is eminently reasonable. So you've already given away what could have been a winning argument, right? I think that's probably true. We did not cross-appeal, and so we could not argue for a change in the judgment. We argued that the royalty he awarded was reasonable by generous, by definition. Should this court reach out and do something that you didn't ask it to do? And on what basis? It would be fine with me if the court did it. But I cannot. Of course. You know, the answer to your first question is it would be fine with me if the court could do that. Let's go to the second one. On what basis would we do something that you didn't ask us to do? It is the court is always empowered to correct clear error, as I'm aware of. But I did not cross-appeal this issue and cannot argue under this court's precedent for that change, as I understand it. But I believe the court always has the power to correct clear error where it perceives it. In fact, I believe that in one of its earlier briefs to this court in prior appeals, Mirror Light itself represented that this injection molding process that could be used to create a non-infringing mirror was available as early as 1992, and maybe even before that, and so could be used to create a non-infringing mirror, even if no one had as of that time. But under the grain processing case, that's sufficient to create a non-infringing alternative. Moving back, if it's okay, to the question of infringement, this other evidence that Mirror Light says it presented was even less credible to Judge Sifton and not even presented as evidence of infringement, really, until the reply brief in this case. Mr. Swain, who was not qualified as an expert, whose hands did shake and therefore couldn't do reliable tests at all, testified he did not even observe the dial of the spherometer while he was moving it across the mirrors. So how he could have detected a decrease in the radius of curvature is difficult to understand. The manufacturing process does not inherently result in an infringing mirror. The manufacturer in this testimony was unrebutted. It testified that it accounted for any shrinkage that would occur through software programs and created the molds accordingly so that the mirror would have the constant radius of curvature Roscoe specified. The 30 thousandths of an inch tolerance is not a tolerance for the decrease in radius of curvature. It's a tolerance for the absolute radius of curvature, whether it's 3 feet or 3 feet and 30 thousandths. What if customers want the expanded view? There's no record of any customer ever asking for that expanded view. What these customers ask for is a device that meets the federal regulations, which specifies a certain field of view. It does not specify how you achieve that field of view, and the record is undisputed that you could achieve that field of view with a non-infringing mirror, such as Roscoe did. The record's also clear that the patented way of expanding the field of view has certain disadvantages. It creates distortions in the image and differences in the size of the image, which lead to competing considerations for customers too, because they not only want to see broader, but see more clearly. There was no demand for the patented mirror, and in fact the mirror light itself did not practice this patent until 2005. It sold another mirror in competition with Roscoe's mirrors that was not under the patent, and even today views the non-patented mirror itself as safer than the patented mirror. I know I have time left, but I'd like to ask a question. Thank you, Mr. Stoner. If you don't have anything else, we'll hear from Mr. Arts. Thank you. You have your full three minutes, Mr. Arts. Thank you. I think Roscoe's counsel took great liberty with what their actual testimony is. We have this also as an issue of future lost profits, because assuming that 1, 2, and 5 did not infringe from 2000-2005, mirrors 3 and 4 did. They commingled them. They sold them all. It's basically a bait-and-switch, similar to the bait-and-switch of American City. Therefore, we're entitled to future lost profits on that issue. On the period of time from 2000-2005, which is authority from this court relative to that. They took the market away from mirror-like. They never told the customers they had made a change, if, indeed, they did make a change. I really disagree that this variance is not a decrease. It has to be a decrease, because that's what the customers wanted. That's why Roscoe ran away from the Sperrano test. That's why it made these other tests, because it knew it showed a decrease in the radius of curvature. Just one little thousandth of an inch was enough. Roscoe knew it had to have it, because that's what his clients had. Roscoe never certified its mirrors, anything that had a constant radius of curvature. So he couldn't have used any of those others. The only way you could have anything which met the FMVSS is to have it certified. You've got to put a bus on a stand with all these cylinders around and test it and take detailed records of it. Roscoe never did that. So there's no proof that a non-fringing mirror with an increase in radius of curvature would meet the Federal Motor Vehicle Safety Standards. None whatsoever. And so, therefore, the only mirrors that were out there had a decrease in radius of curvature. That is why Roscoe got the market. They have 95 percent of the market with their mirror, because of its decrease in radius of curvature, because of the safety it's given schoolchildren when they had this crisis and they had a change in the early 90s. In scientific, what Judge Lynn was just saying here about that, what difference would it make if he had listed 25 passes and said, decrease, decrease, decrease, decrease, decrease. That's all he had to do. So he remembered that. It's very easy. When you do this, you can actually see it move. It moves in the same direction every time. What's more scientific than repeatability and to show consistency? And that's what he did. He did the three mirrors for Roscoe, and then he did another 24 to 30 mirrors. This is Professor Hall. Every one he said indicated at least six passes, at least six times. He called the pass was a test. He multiplied that out. It's well over 100. Every one had a decrease in radius of curvature. Every one. Not one had an increase. So what you're doing, if you say that the variance now in a tolerance is not infringement, you're giving a tolerance exception to infringement. And there is no such thing, particularly when the claim has been construed to require any decrease whatsoever, even whether it's in a tolerance or not. Their tolerance we're talking about is 30,000, and the courts have already found lenses with less than 30,000 for infringement. So they didn't really go take any steps to avoid infringement. They could have made it a constant radius, but then they would have had it certified. It couldn't be certified under the Federal Motor Vehicle Safety Standards. Only if there is a decrease in radius of curvature can it be certified. Thank you, Mr. Arch. All right.